Filed 10/21/15  In re Marriage of Reed CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| CHRISTINE REED, | B253728, B255233 |
| Appellant, | (Los Angeles County Super. Ct. No. BD555764) |
| v. | |
| MARTIN S. REED, | |
| Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Robert Willet, Judge and Marjorie S. Steinberg, Judge.  Reversed in part and remanded.

Laurence M. Berman, Stephen Temko and Dennis Temko, for Petitioner and Appellant.

Parcells Law Firm and Dayton B. Parcells; Tracey Hom and Ryan D. Golds for Respondent.

_____

Following the dissolution of their marriage, Martin Reed and Christine Reed filed a series of motions related to the stipulated judgment setting forth the terms of their divorce. Christine appeals three orders that resulted from the motions, including: (1) an order denying her motion to quash writs of execution Martin had obtained to enforce two prior attorney's fees awards; (2) an order requiring Christine to return property she removed from Martin's residence; and (3) an order granting Martin's motion to modify the amount of the monthly child support payment.

We reverse the order denying Christine's motion to quash, concluding that a settlement agreement precluded Martin from enforcing the attorney's fee awards that served as the basis for his writs of execution. We reverse the order modifying Martin's child support payment based on the trial court's failure to provide a statement of decision. We affirm the order requiring Christine to return property she removed from Martin's residence.

## FACTUAL BACKGROUND

On June 14, 2012, the trial court entered a stipulated judgment of dissolution terminating the marriage of Martin Reed (husband) and Christine Reed (wife). The judgment contained provisions describing how the parties had agreed to divide their property, which included three residential properties located in Los Angeles County, California. Wife was assigned ownership of a residence located in Malibu, California. Husband was assigned ownership of a residence located on Thayer Avenue in Los Angeles, California (the Thayer residence). The parties agreed they would sell their third residence, located on Beverly Drive in Beverly Hills, California (the Beverly residence), which was being renovated at the time of their divorce proceedings. Under the terms of the judgment, husband was required to use his separate funds to pay for the constructions costs necessary to complete the renovation. Following the sale of the Beverly residence, husband was to be reimbursed "100% [percent] of any such payments up to the sum of $325,000" and any payments "in excess of $325,000" if the residence sold for $6 million or more.

2

Section 7.9 of the judgment described how the proceeds from the sale of the Beverly residence were to be distributed. The initial set of costs to be paid from the proceeds included the balance of the sum they had borrowed to purchase the property, the closing costs of the sales transaction and the costs husband had incurred in renovating the residence. The second set of costs to be paid with the proceeds included various sums the parties had borrowed against their other properties and insurance policies. Any remaining proceeds were to be divided equally between them.

The judgment also described various payments husband agreed to make to wife. Section 14 provided that husband was to pay wife spousal support in the amount of $11,000 per month "until the close of escrow on the sale of the Beverly residence." Upon close of escrow, husband was to pay wife $150,000 per year for a period of five years ($750,000 total), commencing one year from the date of the close of escrow. However, husband was entitled to a "credit against the payment of the $150,000 per year" in the amount of $5,500 per month for each month he was required to pay the $11,000 spousal support. The credit was to be "applied pro-rata over the five year term."[1]

Section 10 additionally required that, upon the close of the Beverly residence escrow, husband was to issue wife a "noninterest bearing" loan in the amount of $750,000. Wife was required to repay the loan in five annual payments of $150,000, with the first payment due one year from the date of the close of escrow. If wife failed to make any of the annual payments at the time they were due, husband was permitted to "deduct any unpaid payment (or portion thereof) from any outstanding spousal support owed . . . pursuant to paragraph 14."

Section nine required husband to pay wife a separate "equalization payment" of $1,200,000 plus 4% [percent] interest, which was to be paid over a seven-year period following the close of the Beverly residence escrow. For the first four years, husband

---

[1] The judgment included the following example to illustrate how the "credit" was to operate: "if the close of escrow of the sale of the Beverly Drive residence shall occur after twelve months of [husband paying the monthly $11,000 spousal support payment], then [husband's remaining] spousal support obligation . . . shall be reduced to $136,800 per year ($5,500 x 12 = $66,000/5 = $13,200; $150,000 - $13,200 = $136,800.)"

3

was to pay wife $4,000 a month (which equaled the interest payment on the principal); in the fifth through seventh years, husband was to pay wife $5,000 a month; at the conclusion of the seven-year period, husband was to make a "balloon payment" equal to the remaining principal and any accrued interest.

The judgment addressed numerous additional issues related to the dissolution, including payment of child support (husband was required to pay $7,000 a month), custody of the children, use and ownership of the parties' automobiles and the parties' duties to pay various tax obligations.

Following the termination of their marriage, husband and wife filed a series of motions related to their respective obligations set forth in the judgment. The motions involved, among other things: husband's claim for reimbursement of approximately $1.5 million he had spent to complete the renovation of the Beverly residence; husband's claim that wife had concealed $50,000 in cash during the negotiation of the judgment; husband's request for modification of the child support payment; husband's motion for an order requiring wife to return property she had removed from the Thayer residence; wife's motion to set aside the dissolution judgment; and wife's claim that husband had failed to make several of the payments required under the judgment, including the equalization payment, the spousal support payment and the $750,000 loan that was due upon close of the Beverly escrow.

Wife has appealed three orders that resulted from these various motions. In Case Number B255233, wife appeals: (1) an order denying her motion to quash two writs of execution husband had obtained to enforce prior orders awarding him attorney's fees; and (2) an order requiring wife to return property she had removed from the Thayer residence. In Case Number B253728, wife appeals an order reducing husband's child support payment.[2] The factual and procedural summary related to each of the appealed orders is discussed in more detail below.

---

[2]     Wife filed a separate notice of appeal from each of the three orders, which initially resulted in three different appellate case numbers. We ordered wife's appeal from the order denying her motion to quash husband's writs of execution (originally assigned case

4

In case number B255233, wife appeals the trial court's order denying her motion to quash two writs of execution and an order requiring her to return property she removed from the Thayer residence.

## A. The Trial Court Erred in Denying Wife's Motion to Quash

Wife contends the trial court erred in denying her motion to quash two writs of execution that husband obtained as a means to enforce two prior orders awarding him attorney's fees under Family Code section 271.[3] Wife contends the court should have quashed the writs because the terms of a settlement precluded husband from executing on those awards.

### 1. Factual summary

#### a. Summary of events preceding the parties' settlement

During the six-month period following entry of the stipulated judgment, husband and wife filed a series of motions against one another related to their divorce. In September of 2012, husband filed an omitted asset claim alleging wife had concealed $50,000 in cash that constituted community property. Husband sought an order awarding him the omitted funds and the attorney's fees he had expended in litigating the claim.

---

number B255233) and her appeal from the order requiring her to return property removed from the Thayer residence (originally assigned case number B256413) to be consolidated under Case Number B255233. Wife's appeal from the order modifying the child support payment, assigned Case Number B253728, was not included in our consolidation order. Accordingly, this decision addresses two separate appeals: Case Numbers B255233 and B253728.

[3]     "Section 271 provides that a family court may impose an award of attorney fees and costs 'in the nature of a sanction' where the conduct of a party or attorney 'frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys.' (§ 271, subd. (a).) . . . . [¶] . . . [¶] Sanctions under section 271 are appropriate whenever a party's dilatory and uncooperative conduct has frustrated the policy of promoting settlement of litigation and cooperation among litigants." (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1316-1317.)

Following a hearing, the court granted husband's motion, concluding that the $50,000 had not been adjudicated in the judgment and that wife had "breached her fiduciary duty with regard to the community asset by intentionally misleading [husband] for the purpose of depriving him of his community rights to that money." As a remedy, the court awarded husband the omitted asset and his "attorney fees and costs according to proof." Husband subsequently submitted a request for attorney's fees totaling $13,670.00.

In November of 2012, the parties sold the Beverly residence for more than $6 million. The "net proceeds of the sale," which totaled approximately $2.8 million, was placed into escrow (the Beverly escrow). Husband then filed a motion seeking approximately $1.5 million from the Beverly escrow to reimburse the costs he had incurred in renovating the residence. Husband asserted the renovations had cost significantly more than originally estimated because wife had hired "unqualified" laborers whose work resulted in numerous construction defects. Wife opposed the reimbursement claim, arguing that husband had breached his fiduciary duties by hiring his son (from a former marriage) to serve as the general contractor and then overpaying him for the project.

Wife also filed a motion to set aside the dissolution judgment, contending that husband had "made it financially impossible for [her]" to obtain independent counsel to aid her in negotiating the terms of the divorce. Wife also argued husband had attempted to "defraud" her by (among other things): (1) inflating his true costs of the Beverly residence renovation; (2) misrepresenting the value of the Thayer residence; and (3) misrepresenting the parties' respective incomes.

On February 27, 2013, the court held a hearing on numerous matters pending between the parties, including husband's reimbursement claim, wife's motion to set aside the judgment and husband's request for $13,670 in attorney's fees incurred in litigating the omitted asset claim. The court informed the parties that an evidentiary hearing would be necessary to resolve husband's reimbursement claim and scheduled a pretrial conference. The court then heard argument on wife's motion to set aside the judgment, which it denied, concluding that she had failed to demonstrate any basis for such relief.

6

The court also awarded husband attorney's fees as "sanctions pursuant to Family Code 271," explaining that the evidence showed wife's motion was "based on untrue statements and . . . brought in bad faith."

Finally, the court approved husband's request for $13,670 in attorney's fees related to the omitted asset claim. The court clarified, however, that wife would not be required to pay the award until the parties had resolved husband's reimbursement claim. The court thereafter entered an order stating: "The Court . . . orders that [wife] shall pay . . . $13,670 in 271 sanctions to [husband] representing [husband's] attorney's fees, the payment of which shall be set by further order of the court after the parties settle or after the trial on the reimbursement issues is concluded."

Several weeks after the February hearing, husband filed a request seeking approximately $275,000 in attorney's fees incurred in opposing the motion to set aside the judgment and an additional "penalty" of $225,000. At a hearing on June 25, 2012, the court granted the request in part, ordering wife to pay husband approximately $109,000 in attorney's fees. The parties stipulated, however, that: (1) wife was not required to pay the award until husband's reimbursement claim was resolved; and (2) the award was to be paid directly from wife's share of the Beverly escrow. They also agreed that a portion of the attorney's fees award would be offset by a prior $9,000 attorney's fee sanction the court had awarded wife regarding a dismissed civil complaint husband had filed against her.

Pursuant to the parties' stipulation, the court entered an order stating: "[Wife] owes [husband] $109,920.38 in Family Code section 271 sanctions as a result of the [costs he incurred in litigating the request for an order to set aside the judgment], and [husband] owes [wife] $9,714 in Family Code section . . . 271 sanctions . . . ; The Court Orders that [wife] shall be charged with the net sum of $100,207.38 from her sole share of the Beverly [escrow] proceeds. The sum of $100,207.38 shall be paid from the escrowed funds . . . and charged to the ultimate share of the escrowed funds which [wife] is to receive . . . . []"

7

During the June 25th hearing, the court also ordered the parties to attend a mediation on husband's reimbursement claim. (See Code Civ. Proc., § 639.) The court stated that if the parties were unable to reach an agreement, a pretrial conference would be held on August 28, 2013. The court was scheduled to hear several other pending motions on that date, including (among other things): (1) wife's claim that husband had been failing to pay her the full amount of the "equivalent payment" required under section nine of the dissolution judgment; (2) wife's request for escrow instructions directing that husband issue her the $750,000 loan described in section 10 of the judgment; (3) husband's motion for possession of the parties' Aston Martin; (4) husband's request for an executed deed to the Thayer residence; and (5) husband's motion for reduction in his child support payment.

### b. *The settlement*

Following an unsuccessful mediation of husband's reimbursement claim, the parties returned to court on August 28, 2013. Because Judge Robert Willet's courtroom (the parties' home court) was dark that day, the matters were heard by Judge Scott Gordon, who continued the hearing until September 5, 2013. The parties agreed, however, to participate in a mediation with Judge Gordon on September 3rd.

After a mediation held in Judge Gordon's chambers, the parties announced they had reached an agreement that resolved many of the issues pending between them. At Judge Gordon's request, the parties placed the terms of their settlement on the record. Husband's counsel stated that the parties had agreed to take the evidentiary hearing on husband's reimbursement claim off calendar and distribute the $2.8 million Beverly escrow as follows: wife was to receive $862,000 with the remainder to husband. The parties also agreed that: (1) husband would take possession of the Aston Martin and, in exchange, pay $142,500 into an educational fund for the parties' children; (2) husband would resume paying the $4,000 equalization payment with no further offsets; (3) the parties' counsel would negotiate final escrow instructions directing the release of the remainder of the $750,00 loan required under the judgment.

8

When asked whether the settlement included any other terms, husband's counsel stated: "[T]he other thing that we agreed on in chambers is that all attorney's fees to date, whether 2030 fees or 271 fees, are to be borne by each party," clarifying that this provision did not apply to any fees incurred after the date of the hearing (September 3, 2013). Wife's counsel confirmed she agreed with this term of the settlement, explaining that there would be no "additional motions based on conduct to date." The court obtained each party's consent to the settlement and then directed them to prepare a written order of settlement.

On October 2, 2013, the parties appeared before Judge Gordon to resolve various disputes about the specific language that should be incorporated into the settlement order. On the issue of attorney's fees, husband requested that the settlement incorporate language that tracked the statements counsel had made during the September 3rd hearing: "All attorney's fees up until and including September 3, 2013, whether § 2030 or § 271 are to be borne by each party. This does not include any litigation going forward." Wife's counsel, however, requested that the provision include specific language clarifying that it extended to any attorney's fees that had previously been awarded to either party as a sanction. Wife's counsel asserted this language was consistent with the agreement the parties had reached during the mediation in Judge Gordon's chambers.

Judge Gordon questioned whether the two proposals differed in their effect, noting that "the language of [the September 3rd] transcript" indicated that both sides had agreed to bear all of the attorney's fees they had accrued prior to the hearing date, including any fees that were awarded as a sanction. Husband disagreed, stating that he believed he had "a valid June 25th order [for attorney's fees] . . . [and] . . . did not waive anything with regard to that order . . ." Judge Gordon, however, explained that husband's current position conflicted with the language set forth in the September 3rd transcript: "[T]hat is different than the settlement that you agreed to. . . . That is different than what that states. Because the plain language of this is that . . . everyone bears their own costs historically, that's how this reads. So what [husband] is articulating is different, so you would have to bring a motion to set [the settlement] aside because that is different."

9

Ultimately, Judge Gordon elected to incorporate the language husband had proposed, but clarified that he interpreted the language to mean "as of the date of September 3rd, the parties have waived any kind of fee and they're bearing their own cost. And to go back and try to enforce an order [awarding fees] would be in conflict of this. That's the way I read that." Husband's counsel then requested the court to "clarify" whether it was "ruling" on the meaning of the language in the settlement or merely providing its "opinion" on the issue. In response, the court stated: "I indicated what I think the judgment says. [¶] . . . . It's very clear to me, that's the judgment. . . . [T]hat's the order that I'm making. [¶] . . . . That's the judgment. That's as I understand the settlement on its face. We'd have to bring a motion to set aside to do something other than that." The following exchange then followed:

HUSBAND: The question I'm asking is that when I get my writ of execution for $110,000 –

COURT: If you do that, I think you're violating the order and I think you're violating the settlement if you attempt to get a writ of execution.

HUSBAND: There would be a hearing on it.

COURT: It's up to you. If you want to file a hearing in the home court, but I'm telling you what I think the order clearly says.

HUSBAND: Well, okay.

COURT: You can bring a motion to set aside if you wanted.

After the hearing, Judge Gordon signed a written order of settlement stating, in relevant part: "11. All attorney's fees up until and including September 3, 2013, whether § 2030 or § 271 are to be borne by each party. This does not include any litigation going forward. Any additional motions or litigation on the remaining issues, if unable to be settled, or any fees claims past September 3, 2013, are fine."

10

## c. *Wife's motion to quash husband's writ of execution*

On January 10, 2014, husband, acting pro per, obtained two writs of execution that sought to enforce the prior attorney's fees awards related to the omitted asset claim and the motion to set aside the judgment. After wife was informed her accounts had been levied, she filed a motion to quash the writs of execution arguing that Judge Gordon had specifically found paragraph 11 of the settlement precluded husband from enforcing those awards. In support of her motion to quash, wife filed a request for judicial notice requesting that the court take notice of the settlement order and the transcripts from the September and October settlement hearings before Judge Gordon.

In opposition, husband argued that paragraph 11 related solely to attorney's fees that had been incurred in litigating the specific claims and motions the parties had resolved through the settlement, which did not include the omitted asset claim or the motion to set aside the judgment. Husband contended that because paragraph 11 did not specifically reference the February 27th or June 25th orders awarding him attorney's fee pursuant to section 271, the settlement did not preclude enforcement of those orders. Husband also argued the court should not consider the statements Judge Gordon made at the October hearing "regarding the interpretation of the [settlement] order . . . because Judge Gordon was [sitting as] a non-decisional making neutral" when he made those comments. As with wife, husband filed a request for judicial notice requesting the court take notice of the transcript from the October 2nd hearing.

Judge Willet denied wife's motion to quash the writs of execution. The court concluded that paragraph 11 only applied to attorney's fees that related to the two motions identified in paragraphs one and two of the settlement order, which included wife's motion for escrow instructions requiring disbursement of the $750,000 loan and husband's motion for possession of the Aston Martin and an executed deed to the Thayer residence. The court explained that because both motions had "included requests for 271 sanctions, it [was] clear that [paragraph 11] resolved th[ose] pending requests for sanctions. There is absolutely nothing in [paragraph] that waives either party's right to collect on previous orders for sanctions entered in this matter."

11

Although the trial court acknowledged that both parties had requested it take judicial notice of the transcript of the October 2nd hearing, it declined to do so because neither party had provided a copy of the transcript that "contain[ed] a clerk's stamp or conforming stamp indicating that the original [wa]s part of the court's file." The order did not discuss the statements Judge Gordon had made at the October 2nd hearing.

2. *The settlement order precludes enforcement of the February 27th and June 25th orders awarding husband attorney's fees as a section 271 sanction*

Wife argues the trial court should have granted her motion to quash because the parties' settlement precluded husband from enforcing the prior attorney's fees awards on which his writs of execution were predicated. Wife contends that, consistent with Judge Gordon findings at the October 2nd hearing, the language of paragraph 11 requires both parties to bear any attorney's fees they incurred prior to September 3, 2013, which necessarily includes any fees awarded as a section 271 sanction. Husband, however, contends that Judge Willet properly concluded paragraph 11 was only intended to apply to attorney's fees that were incurred in litigating the two motions that were specifically referenced in the settlement order.

"A settlement agreement is interpreted according to the same principles as any other written agreement. [Citations.] It must be interpreted to give effect to the mutual intent of the parties as it existed at the time, insofar as that intent can be ascertained and is lawful. [Citations.]." (*Leeman v. Adams Extract & Spice, LLC* (2015) 236 Cal.App.4th 1367, 1374.) "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.] [¶] . . .[¶] Extrinsic evidence is . . . admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible." (*Morey v. Vannucci* (1998) 64 Cal.App.4th

12

904, 913 (*Vannucci*); see also *In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439; *Jacobson v. Jacobson* (1963) 211 Cal.App.2d 580, 583.)

The interpretation of a written agreement is a question of law which we review de novo "where (a) the trial court's . . . interpretation is based solely upon the terms of the written instrument without the aid of extrinsic evidence; [or] (b) there is no conflict in the . . . extrinsic evidence. . . ." (*Vannucci, supra,* 64 Cal.App.4th at p. 913.) "This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence. . . . If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the [trier of fact]." (*Wolf v. Walt Disney Pictures and Television* (2008) 162 Cal.App.4th 1107, 1126.)

"To ascertain the intent of the parties, we must first resort to the language of the [agreement] itself." (*Rancho Pauma Mutual Water Company v. Yuima Municipal Water District* (2015) 239 Cal.App.4th 109, 115 (*Rancho Pauma*).) Paragraph 11 of the settlement order states: "All attorney's fees up until and including September 3, 2013, whether § 2030 or § 271, are to be borne by each party. This does not include any litigation going forward. Any additional motions on the remaining issues, if unable to be settled, or any fees claims past September 3, 2013 will be fine." While not a model of clarity, the language of paragraph 11 essentially provides that: (1) each party will bear "all" attorney's fees he or she incurred prior to September 3, 2013; (2) the parties are not prohibited from filing motions for attorney's fees incurred on any matters (including any pending matters not resolved by the settlement) litigated after September 3, 2013. There is no language in the provision excluding attorney's fees incurred prior to September 3, 2013 that were the subject of a section 271 sanction award. Indeed, paragraph 11 specifically references "§ 271," suggesting the parties did intend that their agreement would include attorney's fees previously awarded as a section 271 sanction. Because husband's omitted asset claim and wife's motion to set aside the dissolution judgment were both fully adjudicated prior to September 3, 2013, the language of paragraph 11 requires the parties to bear the fees they incurred in relation to those matters, thereby precluding enforcement of the February 27th and June 25 attorney's fee orders.

13

This interpretation is supported by "extrinsic evidence . . . of the circumstances under which the parties negotiated or entered into the [settlement]." (*Manufactured Home Communities, Inc. v. County of San Luis Obispo* (2008) 167 Cal.App.4th 705, 714; see generally *Rancho Pauma, supra,* 239 Cal.App.4th at p. 115 ["We may . . . consider extrinsic evidence where it will assist in determining a contract's meaning: '"[T]he test of admissibility of extrinsic evidence . . . is . . . whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]" [Citation.]' [Citation.]"].[4]) At the time the parties entered into their settlement agreement, wife was not yet obligated to pay the section 271 attorney's fees the court had awarded at the February and June hearings. At both hearings, the trial court clarified that wife would only be required to pay those awards after husband's reimbursement claim had been resolved and the Beverly escrow proceeds had been distributed between them. Moreover, at the June 25th hearing, the parties specifically agreed husband's $109,000 attorney's fees award was to be paid directly from the Beverly escrow and charged against wife's share of those proceeds. At the September 3rd hearing, the parties announced they had reached a settlement on how to divide the Beverly escrow proceeds, which effectively resolved husband's reimbursement claim. The parties explained that under their agreement, wife was to receive $862,000 from the escrow and that husband would receive the remainder, later adding that they had further agreed "all prior attorney's fees," including "271 fees," would be "borne by each party." The parties did not make any statements suggesting that wife's portion of the escrow was to be reduced an additional $114,000 to pay for the prior attorney's fees awards. The parties' statements and conduct at the September 3rd hearing suggest that they intended any prior attorney's fees awards, including those awarded under section 271, were to be subsumed into the distributions they had agreed to in the settlement. This is consistent with the language of paragraph 11.

---

**4**     Neither party has objected to our consideration of extrinsic evidence; indeed, both parties submitted extrinsic evidence in the trial court and rely on extrinsic evidence on appeal.

Husband, however, argues paragraph 11 should be interpreted more narrowly, contending that other language in the settlement shows the attorney's fee provision was only intended to apply to fees incurred in relation to two motions identified in paragraphs one and two of the document, which state: "1. This order resolved the Requests for Orders filed by [wife] on June 12, 2013 for Entry of Escrow Instructions and Release of funds. [¶] 2. This Order resolves the Request for Order filed by [husband] on June 17, 2013." Wife's June 12th "request for order" (RFO) sought escrow instructions directing the release of the loan described in sections 10 and 6.1.a.6(c) of the dissolution judgment.[5] Husband's June 17th RFO sought possession of the parties' Aston Martin and a deed to the Thayer residence. Husband contends that because the June 12th and June 17th RFOs were each accompanied by a "'request[] for 271 sanctions, it is clear that paragraph 11 [only] resolved [those] pending requests for [attorney's fees] sanctions.'" Thus, husband effectively contends we should interpret paragraph 11 as applying only to attorney's fees incurred in litigating the RFOs that were actually resolved through the settlement.

There are several problems with this interpretation. First, contrary to husband's suggestion, the June 12th and June 17th RFOs were not the only issues resolved through the settlement. Indeed, the parties' agreement addressed a wide range of additional issues that were pending between them, including: (1) husband's reimbursement claim for the costs he incurred in renovating the Beverly residence; (2) division of the Beverly escrow proceeds; (3) husband's compliance with the "equalization payment" requirement set forth in section nine of the judgment; and (4) the parties' respective obligations to pay

---

**5** Section 10 of the judgment provided that husband would issue wife a "non-interest bearing" loan of $750,000 upon the close of escrow of the sale of the Beverly Drive residence." Section 6.1.a.6(c), in turn, provided that "an escrow shall be opened by [wife] and [husband] to document, disburse, and record [the] $750,000 . . . loan," which was to be secured by a deed of trust to the Malibu residence.

15

any costs that might result from a pending "*Borson* motion."[6]  Given the wide range of issues addressed in the agreement, we find no basis to conclude that paragraph one and two's references to the June 12th and 17th RFOs shows that paragraph 11 was limited to fees incurred in litigating those two specific matters.

Moreover, husband's proposed interpretation is not consistent with the language of the attorney's fees provision.  Paragraph 11 contains no language suggesting it was limited to fees incurred in litigating the June 12th and June 17th RFOs.  Rather, as explained above, the provision states that each party agreed to bear "all" attorney's fees he or she had had incurred "up until and including September 3, 2013."  Husband's interpretation would effectively require us to read a limitation into the provision—that it applied only to fees related to the June 12th and June 17th RFOs—that does not exist.  (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1385-1386 ["when 'constru[ing] an instrument, . . . [courts may] "not . . . insert what has been omitted, or . . . omit what has been inserted . . . ."'  [Citations.]"] [citing *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954 & Code Civ. Proc., § 1858].)  Husband's interpretation would also render meaningless a portion of the language that does appear in Paragraph 11.  (See *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1507 ["when interpreting a contract, we strive to interpret the parties' agreement to give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable."].)  If the provision was only meant to apply to fees incurred in litigating the June 12th and June 17th RFOs—both of which were explicitly resolved through the settlement announced on September 3rd—there would have been no reason to include language stating that the provision only applied to fees incurred on or before September 3, 2013 and that it did not apply to "any litigation going forward."  Had the parties merely intended paragraph 11 to apply to the June 12th and June 17th RFOs,

---

**6**　　A "*Borson* motion" permits "a discharged attorney to pursue a request for direct fee payment from the former client's spouse if the request is expressly or impliedly authorized by the former client." (*In re Marriage of Erickson & Simpson* (2006) 141 Cal.App.4th 707, 709; see also *In re Marriage of Borson* (1974) 37 Cal.App.3d 632.)

16

they could have stated as much in the agreement.  By choosing broader language referencing "all attorney's fees" incurred on or before September 3, 2013, we must presume they had a broader intent.

Given the broad phrasing of paragraph 11, and its specific reference to section 271, we conclude the provision was intended to preclude enforcement of any section 271 awards that related to attorney's fees incurred prior to September 3, 2013.  Accordingly, the court should have granted wife's motion to quash the writs of execution.[7]

### B. The Trial Court Did Not Err in Ordering Wife to Return Property She Removed from the Thayer Residence

#### 1. Factual Summary

On September 20, 2013, husband filed a motion for an order requiring wife to return various items she had removed from the Thayer residence, including (among other things) two floor lamps, a vase, a blender, a "large wooden bucket" and a "statue of a bear that sat on the fireplace mantle."  In support of these requests, husband cited language in section 6.2.a of the dissolution judgment stating that he was awarded "[a]ll of the parties' right title and interest in [the Thayer residence], together with all furniture, furnishings and artwork therein."

In opposition, wife argued that husband's request was barred by paragraph 12 of the settlement order, which states:  "There will be no additional motions based on conduct prior to September 3, 2013."  Although wife admitted she had removed the items from the Thayer residence, she asserted that paragraph 12 precluded husband from seeking their return because she had removed the items before September 3, 2013.

The court rejected wife's argument, explaining that the language in paragraph 12 did not "eliminate the obligation of the parties to comply with court orders entered before that date.  A continuing violation of the court order is not excused by that settlement."

---

[7]     Based on our interpretation of the settlement order, we need not address the parties' disputes regarding whether we should consider the transcript of the October 2nd hearing and what effect, if any, we should assign to the comments Judge Gordon made at that hearing regarding the meaning of paragraph 11.

17

The court further explained that "the [dissolution] judgment . . . obligate[d] the [wife] to turn over . . . all furniture, furnishings and artwork. So her obligation to do that continued. And the items . . . that fall within that category are the antique matching floor lamps, the bear statue, . . . the ten-inch high vase, the blender, and the large wooden bucket . . . All of that was encompassed by that judgment."

In response, wife's counsel questioned whether the bear statue should be included in the court's order because wife had "inherited [the item] from her [parent] when she died." The court disagreed, explaining that husband was entitled to the statue "[b]ecause it is artwork, and that is what the judgment said. It didn't say separate property or community property. It just says artwork in the house." Following the hearing, the court issued a written order requiring wife to return items she removed from the Thayer residence, including the bear statue.

> 2. *The settlement agreement did not permit wife to continue withholding property that was assigned to husband under the terms of the judgment*

Wife asserts the trial court committed two errors in granting husband's request that she be ordered to return property she removed from the Thayer residence. First, wife asserts that "under the plain terms of the [settlement agreement], [h]usband was barred from bringing . . [a motion] based on the 'conduct' . . . which was alleged to have occurred prior to September 3, 2013." Second, she argues that the court erred in ordering her to return the bear statue because she provided evidence showing the statute was her separate property.

Wife's first argument is predicated on paragraph 12 of the settlement order, which provides that the parties would bring "no further or additional motions based on conduct prior to September 3, 2013." Even if we were to assume this language was actually intended to preclude motions based on any conduct occurring before September 3, 2013, husband's request for the return of his property does not fall within that prohibition. The conduct at issue in husband's motion was wife's refusal to return property that had been assigned to him under the terms of the dissolution judgment. Wife's withholding of

18

husband's property was a continuing act in violation of the judgment that persisted after September 3, 2013.

We also reject wife's contention that she should have been permitted to retain the "bear statue" based on evidence that she inherited the statue from her parent. As explained by the trial court, regardless of whether the bear statue initially qualified as her separate property, the terms of the dissolution judgment transmuted the statue to husband's separate property.

Family Code section 850 states in part: "Subject to Sections 851 to 853, inclusive, married persons may by agreement or transfer, with or without consideration, do any of the following: [¶] . . . [¶] (c) Transmute separate property of one spouse to separate property of the other spouse." Section 852, subdivision (a) states: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." A statement qualifies as an "express declaration" within the meaning of section 852 if it "expressly stat[es] that a change in the characterization or ownership of the property is being made. [Citation.] . . . . [¶] An 'express declaration' does not require use of the terms 'transmutation,' 'community property,' 'separate property,' or a particular locution. [Citation.]" (*In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 663-664 [citing and quoting *Estate of MacDonald* (1990) 51 Cal.3d 262, 272-273].) Thus, section 852 "requires only a clear demonstration of a change in ownership or characterization of the property at issue." (*In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 593.)

The dissolution judgment contains express language confirming that any prior interest wife may have had in the bear statue was transferred to husband as his separate property. Section 5 of the judgment states that although the parties had previously disputed "what constitutes their community, quasi-community property, and separate property[,] . . . [they] ha[d] resolved such issues and . . . agreed that their property (regardless of how characterized) shall be divided between them" in the matter set forth in the judgment. Section 6.2 of the judgment further states: "The following assets

19

are . . . awarded to [husband] and/or confirmed as his sole and separate property and [wife] shall have no right, title or interest in or to them. Any right, title or interest which [wife] may have is hereby assigned and transferred to [husband][:] . . . [¶] All of the parties' right, title and interest in the real property located at 624 Thayer Ave. . . . . together with all furniture, furnishings and artwork therein." These provisions expressly declare that, regardless of what property rights the parties may have had prior to entry of the stipulated judgment, all "furnishings" and "artwork" within the Thayer residence qualified as husband's separate property. Wife has presented no argument or authority suggesting that the bear statue, which sat on the mantel of a fireplace within the Thayer residence, did not qualify as a furnishing or artwork. Thus, under the terms of the judgment, husband was entitled to the statue.

## CASE NUMBER B253728

In Case Number B253728, wife appeals the trial court's order modifying husband's child support payment. We reverse, concluding that the court erred in calculating wife's gross income and by failing to provide a statement of decision.

### A. Factual Background

#### 1. Summary of request for modification of the child support payment

On June 13, 2013, husband filed a request for an order reducing the monthly child support payment from $7,000 (the amount set forth in the dissolution judgment) to approximately $4,000 a month.[8] Husband argued the reduction was justified because his overall monthly income had dropped more than 50% [percent] during the prior twelve-month period. Husband asserted that the decrease in income was primarily caused by a reduction in his "self-employment income"—i.e., profits from his law firm—which had

---

[8]    Husband initially sought to reduce the child support payment to approximately $3,000 a month, which was based on a 25% [percent] timeshare of custody. However, while his request for modification was pending, a dependency matter arose that resulted in wife taking full custody of both children. To address this change in timeshare, husband amended his reduction request from approximately $3,000 a month to approximately $4,000 a month.

fallen from $39,500 a month to $7,200 a month. In support of these assertions, husband provided "profit and loss" statements showing that his law firm's revenue over the prior 12-month period was more than $500,000 less than the firm's average revenue during the previous three-year period. Husband also asserted wife's monthly income had increased over the past 12 months from $7,900 to over $18,000 because she was now receiving spousal support.

Wife opposed the modification request, arguing that husband had significantly understated his "self-employment income" by deducting numerous "business expenses" from his law firm's revenue that were actually "personal expenses." In support, wife provided a declaration from Jennifer Ziegler, a forensic accounting expert, who had reviewed deposition testimony and documents that husband had provided in support of his modification request. Ziegler identified numerous categories of deducted business expenses she believed to be personal in nature, including (among other things): fees husband had paid to administer his personal retirement accounts ; personal automobile and mileage expenses ; personal travel and entertainment expenses; and fees and costs husband had incurred in personal litigation, including payments for legal services that he had made to his son.

Wife also argued husband's income and expense declaration substantially overstated her own income by including the spousal support payment and the equalization payment required under the terms of the judgment. Wife contended these payments should not be attributed as income because husband had routinely failed to make them.

In his reply brief, husband argued wife had presented no evidence disputing that his law firm's revenue had dropped over $500,000 during the prior 12-month period. According to husband, this fact alone warranted a reduction in child support. Husband also argued that the categories of "business expenses" to which wife had objected were "no different in category or type" than the expenses he had claimed when calculating his income for purposes of the dissolution judgment. Husband asserted that because wife had not challenged such business expenses in the past, she should not be permitted to do

21

so now. Husband also provided a declaration stating that many of the individual expenses Ziegler had identified in her declaration were "legitimate" business expenses, including his automobile and entertainment expenditures.

## 2. *Hearing on modification request*

At the motion hearing, husband's counsel emphasized that the undisputed evidence showed the revenue of husband's firm had declined over $500,000 in the prior 12 months, thereby demonstrated a change in circumstance warranting a reduction in child support. Counsel also argued the firm's profit and loss statements showed the firm had reduced its business expenses by more than $200,000 over the same 12-month period, undermining wife's theory that husband was inflating such expenses to understate his self-employment income. Husband's counsel further asserted that it was appropriate to include the spousal support payment in wife's income because the parties had recently reached an agreement that would require husband to begin disbursing those payments in full.

Wife's counsel argued that husband had made no evidentiary showing that the expenses Ziegler had identified in her expert declaration were properly deducted as "business expenses" rather than personal expenses. According to counsel, the only argument husband had presented regarding the deductions was that they were proper because he had "been doing it [the same way] for years." On the issue of spousal support, wife's counsel did not dispute the parties had reached an agreement regarding disbursement of the payments, but argued that it would be improper to attribute those amounts as income until husband actually complied with their agreement.

The court granted husband's modification request, concluding that wife had not shown any of the business expense deductions were improper: "The court is satisfied based on the totality of the evidence that it would be inappropriate and the court exercises its discretion not to include as taxable income the business expenses at issue between the parties and which have not previously been conceded. I've looked at Ms. Ziegler's declaration and I'm not persuaded that in those instances where Mr. Reed has not

22

conceded the point, that there's an appropriate adjustment to be made there." The court also elected to include wife's forthcoming spousal support payments and her equalization payments as income.**9**

After the court announced its ruling, wife's counsel requested a "statement of decision" on several issues related to the modification request, including the "change of circumstance" that warranted a reduction in the child support; "calculation of [husband's] income" and "calculation of [wife's] income." The court denied the request, explaining that it did not believe a statement was required unless the hearing was more than four hours. Following the hearing, the court issued an order stating: "Child Support from July 24 forward shall be $4,061 per month."**10**

## B. Discussion

Wife contends the court committed several errors that require reversal of the child support order, including: (1) treating her spousal support payment as part of her gross income; (2) failing to provide a statement of decision; (3) failing to "add back [h]usband's personal expenses to his business income"; and (4) "fail[ing] to include as income husband's withdrawals from his retirement plans."

"'"[T]he trial court's determination to grant or deny a modification of a support order will ordinarily be upheld on appeal unless an abuse of discretion is demonstrated." [Citation.] Reversal will be ordered only if prejudicial error is found after examining the record of the proceedings below. [Citation.] However, questions relating to the interpretation of statutes are matters of law for the reviewing court. [Citation.]'" (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1150-1151.)

---

**9** The court ruled on various other issues wife had raised that are not directly relevant to this appeal, including whether to include the following sums in husband's gross income: social security payments; contributions made to his 401(k) account and monthly interest that had accrued on the funds in various retirement accounts.

**10** The order further provided that husband's child support payment from June 13, 2013 (the date on which the request for modification was filed) until July 23, which was the last date on which the husband had a custody share of children, was to be $3,207.

### 1. *The trial court erred in treating wife's spousal support payment as gross income*

Wife argues that, under Family Code section 4058, the court was not permitted to include her spousal support payment as gross income when calculating child support.[11] We agree.

"California has adopted a 'statewide uniform guideline' for determining child support according to a complex formula based on each parent's income and custodial time with the child." (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1245 (*McHugh*); see also §§ 4050 & 4055.) "The family law court uses an algebraic formula to calculate the presumptively correct amount of child support. (§ 4055.) In computing guideline child support, the family law court first determines each parent's annual gross income. Section 4058, subdivision (a) defines gross income expansively: 'The annual gross income of each parent means income from whatever source derived, except as specified in subdivision (c) and includes, but is not limited to, the following: [¶] (1) Income such as commissions, salaries, royalties, wages, . . . unemployment insurance benefits, . . , social security benefits, and spousal support actually received from a person

---

[11]     Husband argues wife forfeited this argument by failing to raise it in the trial court. Although wife argued her spousal support should not be considered part of her gross income until husband began making the payment, she never argued that her spousal support payment should have been excluded from her gross income based on section 4058. A party's "failure to present an issue to the trial court generally forfeits it on appeal[. However], we [retain] discretion to consider the issue to the extent it presents a pure question of law or involves undisputed facts. [Citations.]" (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1370; *Waller v. Truck Ins. Exchange*, Inc. (1995) 11 Cal.4th 1, 24.) In this case, whether the trial court erred by including wife's spousal support payment when calculating her gross income is a pure question of law. Moreover, there are compelling reasons to review the issue. "[A] child support obligation '. . . runs to the child and not the parent. [Citation.]' [Citations.]" (*In re Marriage of Comer* (1996) 14 Cal.4th 504, 517 (*Comer*).) "In essence, the parent, to whom such support is paid, is but a mere conduit for the disbursement of that support." (*Williams v. Williams* (1970) 8 Cal.App.3d 636, 640.) Thus, "'the actions of one parent should not diminish the child's right to support.' [Citation.]" (*Comer, supra,* 14 Cal.4th at p. 517.) Given these principles, it would be inappropriate to deny review of an alleged error in calculating the child support payment based solely on wife's failure to raise the issue.

not a party to the proceeding to establish a child support order under this article. . . .' Section 4058, subdivision (c) excludes from annual gross income any child support received for children of other relationships and payments from public assistance programs." (*In re Marriage of Corman* (1997) 59 Cal.App.4th 1492, 1498 (*Corman*).)

As wife correctly notes, our courts have repeatedly interpreted section 4058 to exclude from gross income any spousal support payment received from a party to the child support proceeding: "Although section 4058 defines gross income broadly, and party spousal support is not expressly excluded, the only type of spousal support specifically included in gross income is spousal support from a person who is not a party to the child support proceeding. By necessary implication, the Legislature did not intend the inclusion of spousal support from a person who is a party to the proceeding. Otherwise, spousal support, without qualification, would have been included in the list of qualifying income. Thus, the specific inclusion of nonparty spousal support as gross income impliedly excludes party spousal support, despite the expansive initial definition of gross income." (*Corman, supra,* 59 Cal.App.4th at p. 1498; *In re Marriage of Stanton* (2010) 190 Cal.App.4th 547, 561 [following *Corman's* reasoning].)

Husband does not argue that these cases were wrongly decided nor does he dispute that they apply here. Instead, he asserts that excluding wife's spousal support from her gross income will result in a "de minimus change to the child support award." Even assuming that such error need not be addressed if only a small change would result, husband has provided no evidence demonstrating what impact the exclusion of the spousal support payment would actually have on the amount of the child support payment.

### 2. *The trial court erred in failing to provide a statement of decision*

Wife also contends the trial court erred when it denied her request to provide a statement of decision.[12] The hearing transcript shows that wife requested a statement of

---

[12] Husband argues that wife has forfeited any argument regarding the court's failure to provide a statement of decision because she did not raise the issue until her reply brief. "'Points raised for the first time in a reply brief will ordinarily not be considered, because

25

decision regarding, among other things, the "change of circumstances" justifying a modification in the child support payment, calculation of husband's income and calculation of her income. The trial court denied the request, explaining that it did not believe "the hearing . . . justified having a statement of decision."

The trial court's ruling conflicted with the requirements of Family Code section 3654, which states: "At the request of either party, an order modifying, terminating, or setting aside a support order shall include a statement of decision." Section 3654 thus requires that "[w]hen modifying a support order, the trial court must provide a statement of decision explaining its ruling if requested by either parent. [Citations.] [The] statement . . . must provide the factual and legal basis for the trial court's decision as to each of the principal controverted issues." (*McHugh, supra,* 231 Cal.App.4th at p. 1248 [emphasis omitted].) The requirement set forth in section 3654 "is as much, or more, for the benefit of the Court of Appeal as for the parties. [The statement of decision] 'is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law. [Citation.]' [Citation.]" (*In re Marriage of Sellers* (2003) 110 Cal.App.4th 1007, 1010.)

Although husband concedes error, he contends that the court's failure to provide a statement of decision was harmless because "[t]he record demonstrates that the [trial court] . . . articulated its factual findings and the legal basis for its ruling." In support, husband cites the trial court's oral statements that it had had reviewed Ziegler's declaration and was "not persuaded that" any adjustments should be made to husband's business income due to improperly deducted personal expenses.

---

such consideration would deprive the respondent of an opportunity to counter the argument.'" (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1538 ; see also *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11; *People v. Superior Court of Los Angeles County* (2015) 234 Cal.App.4th 1360, 1384 ["raising arguments for the first time in a reply brief is unfair to the other parties, who lack an opportunity to respond"].) In this case, however, we permitted husband to file a surreply brief addressing the merits of wife's assertion that the court's failure to provide a statement of decision constituted reversible error. He has therefore been provided an adequate opportunity to address the issue.

Even if we were to assume for the purposes of this appeal that a trial court's failure to provide a statement of decision required under section 3654 may be deemed harmless where the court otherwise discloses the legal and factual basis for its decision, the trial court did not do so here.[13] Although wife requested a statement of decision on the issue of whether husband proved a change of circumstance justifying the proposed modification, husband has cited no portion of the record in which the trial court specifically addressed that particular issue. (See generally *In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015 [when seeking to modify a child support order, a party must demonstrate a change in circumstances justifying the proposed modification].)

Wife also requested a statement of decision regarding the calculation of husband's income. The primary argument wife raised in opposing any modification to the child support was that husband had understated his "self-employment income" by improperly deducting business expenses from his law firm's revenue that were in fact personal expenses. In support, wife provided an expert declaration supported by almost 500 pages of exhibits identifying 18 categories of expenses that were improperly attributed as "business expenses." The trial court's assertion that it was "not persuaded" by Ziegler's declaration or the evidence she had relied on is not sufficient to inform the parties of the factual or legal basis for its ruling.

Third, wife asked the court for a statement of decision on the calculation of her income. The court, however, provided no explanation why it rejected wife's argument

---

**13**     Numerous decisions have held or implied that a "trial court's failure to file a statement of decision following a timely request constitutes 'per se reversible error' [citations]" and is therefore not subject to harmless error analysis. (*Wallis v. PHL Associates, Inc*. (2013) 220 Cal.App.4th 814, 825; see also *Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1397-1398; *Sellers, supra,* 110 Cal.App.4th at p. 1010 ["a trial court's failure to render a statement of decision is reversible error"]; *In re Marriage of Ananeh–Firempong* (1990) 219 Cal.App.3d 272, 282-284; *Social Service Union v. County of Monterey* (1989) 208 Cal.App.3d 676, 681; *Miramar Hotel Corp. v. Frank B. Hall & Co*. (1985) 163 Cal.App.3d 1126, 1127-1130.) The issue is currently pending before the Supreme Court. (See *F.P. v. Monier*, 222 Cal.App.4th 1087, review granted April 16, 2014, S216566 [granting review on "whether a trial court's error in failing to issue a statement of decision upon a timely request is reversible per se"].)

27

that husband had overstated her income by attributing $4,000 a month in income from an "equalization payment" that husband routinely failed to pay in full. The court also did not address why the spousal support payment was included in her income, which (as discussed above) was clearly error.

We remand for the trial court to issue a statement of decision on the issues wife has requested.

## DISPOSITION

The order modifying the child support payment is reversed and remanded for a rendering of the statement of decision and a recalculation of the child support payment.

The order denying Christine Reed's motion to quash the writs of execution is reversed and the trial court is directed to enter a new order granting the motion. The order granting Martin Reed's request for the return of property removed from the Thayer residence is affirmed. The parties shall bear their own costs and attorneys fees on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

BECKLOFF, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.